METROPOLITAN LIFE INSURANCE COMPANY *v.* SULLIVAN.

[No. 26,999. Filed March 1, 1938.]

*Miller, Miller & Bredell,* for appellant.

*Julius C. Travis,* and *Paul Rochford,* for appellee.

FANSLER, J.—This action was brought by the appellee to recover as beneficiary of a $1,000 policy of life insurance issued by the appellant upon the life of James Sullivan, the nineteen year old son of the appellee. The appellant defended upon the ground that certain representations made in the application by James Sullivan

were false, and upon the ground that, subsequent to the signing of the application, and before the delivery of the policy and the payment of any premium thereon, the insured became ill from influenza and bronchial pneumonia, and that he was ill of those afflictions, of which he shortly afterwards died, on the day the policy was delivered and the premium paid; and that the appellee, at the time of the delivery of the policy, assured the agent of the appellant that the insured was then in good health. There was a trial by the court, and judgment for the appellee.

Error is predicated upon the overruling of a motion for a new trial, which assigns as causes that the decision of the court is not sustained by sufficient evidence, and that the decision of the court is contrary to law.

It appears that the appellant had issued several small policies upon the life of James Sullivan; that one of these policies had matured to the extent that it had a cash-surrender value approximating the amount that would be required to pay three years' premium on the policy which is the basis of this action; that, upon the suggestion of the agent of the appellant, the insured and the appellee, his mother, agreed that the policy should be cancelled and surrendered, and the cash value used in procuring the policy here in suit. James Sullivan made an application. All of the answers in part B of the application seem to have been filled in by the company's medical examiner. The application was signed by James Sullivan. In the application, the medical examiner certified that he considered the applicant a first-class risk. The application is dated November 2, 1932. The policy when issued was dated November 14, 1932. On November 22nd, a check covering the surrender value of the cancelled policy came to the Indianapolis office of the appellant. It was signed by one of the local officers and turned over to Mrs. Sullivan, in the presence of her

son James, at her home. Mrs. Sullivan indorsed the check and gave it back to the agent and said that James would be down to the office of the appellant on the 25th, at which time he would sign it and give the agent the balance of 87 cents, which would pay three years' premium on the new policy. Thereafter, Mrs. Sullivan went to the office of the company and informed the company's representative that she desired to pay only one year's premium. She got the check and cashed it, and, on December 1st, a representative of the company went to her home and delivered the policy and collected the premium. He testified that, at that time, he asked whether or not James was all right and in good health, and that Mrs. Sullivan replied that he was. The appellee and other witnesses testified that there was no such conversation. Between November 22nd, when the check was turned over to Mrs. Sullivan in the first instance, and December 1st, James Sullivan became ill. He was taken to the hospital, and, shortly after December 1st, died of bronchial pneumonia. In his application, in response to various questions, there were answers that the present condition of his health was good; that he had never been sick; that he had no mental or physical defect or infirmity; that he never had had pneumonia; that he had not been attended by a physician during the last five years; and that he had not had treatment in any hospital or dispensary within the last five years. It appears that he had had an attack of bronchial pneumonia in 1931, and that he had had pleurisy, which kept him out of school, and at home, from November, 1931, until March, 1932. The company's examining physician testified that he wrote all of the answers to these questions in the application, and that a circle around the word, "pneumonia," in the printed form, was not in his handwriting.

The appellant introduced no evidence upon the ques-

tion of the materiality of these proven misrepresentations, and there is no evidence indicating whether ██ or not the company would have issued the policy had it known the true facts. There is evidence that the company had issued a $250 policy upon the life of the insured in May, 1932. The burden was upon the appellant to prove materiality. A question in the application, concerning change in weight of the applicant within two years, was answered, in the handwriting of the examining physician, "Increase 20 adolescence." It is not unreasonable to assume that this was not the answer of the boy, but of the doctor. Whether bronchial pneumonia, in the preceding year, and the protracted attack of pleurisy are of sufficient importance to affect the insurability of an adolescent boy of nineteen, who has gained twenty pounds in two years, and who appears, upon a medical examination, to be a first-class insurance risk, and whether the appellant, if it had known all of the facts, might not have issued the policy, are questions which we are not prepared to determine as a matter of law. The trial court, trying the facts, by its general finding and judgment, reached the conclusion that the appellant had not sustained the burden of proving materiality; and we cannot say that, under the evidence, the trial court reached the wrong conclusion.

When James Sullivan went to the office of the company and talked to its representatives about collecting the dividends, they were not paid to him, but two ██ agents of the company went to his home, when James, Mrs. Sullivan, and a daughter were present, and suggested to Mrs. Sullivan that the matured policy be converted into another type policy, and the cash-surrender value used in paying premiums on the new policy. One agent testified: "Well, I mentioned to Mrs. Sullivan she had the policy there, she could convert or change over to an ordinary Class A contract and

the cash surrendered value on this industrial policy would pay within eighty-seven cents the three years' premium, and we talked about it there, and she said it was all right to fix it up and I wrote the application and James signed it and I left." The other agent testified: "Q. Do you recall any conversation that took place at that time? A. Well, only the usual sales talk that would go with such a case. Q. Do you recall anything Mrs. Sullivan said? A. Well, she answered such questions as we asked. Q. You may state what conversation took place, so far as you recall. A. I cannot recall. The purpose of our call was to sell James Sullivan a Thousand Dollar insurance policy, so we asked Mrs. Sullivan to get the policies out, which she did, and Mr. Stevens picked them up and said she could convert the industrial policy, paid up, and suggested it be used to purchase a Thousand Dollars of ordinary Life insurance, and after a short while, I explained to Mrs. Sullivan what a benefit it would be and Mrs. Sullivan agreed it would be a good idea, and consented to do that, so the applicaton was written and signed by the applicant, and that is about all to it." Part A of the application, which was filled out and witnessed by the agent Stevens, and signed by James Sullivan, and not by his mother, shows, in answer to the question: "Are you now insured in this or any other Company? If yes, give particulars," that James Sullivan had one policy with the Metropolitan Life Insurance Company, issued in 1932, which was not the policy which was paid up. The question: "Is the policy for which you are hereby applying intended to take the place of insurance carried with this or any other Company? If yes, give particulars," is answered, "No." The question: "What amount have you paid in advance on account of the first premium"? is answered, "None." But the appropriate certificate, surrendering the policy, was signed, and the matured policy was taken away,

with the application, by the company's agent, with the clear understanding on the part of Mrs. Sullivan, and, it may be assumed, on the part of the infant insured, that the transaction involved a conversion of the industrial policy into a new $1,000 policy, and the application of the proceeds of the industrial policy, its cash-surrender value, to the payment of premiums on the new policy. Why the agent indicated in the application that the policy applied for was not intended to take the place of insurance already carried, when he told Mrs. Sullivan "she could convert or change over to an ordinary Class A contract," and after the other agent had "explained to Mrs. Sullivan what a benefit it would be and Mrs. Sullivan agreed it would be a good idea, and consented to do that," would seem to be beyond explanation. While it is true that no cash was paid in advance on account of the first premium, the insured and his mother then parted with the insurance provided by the industrial policy, so that James was no longer insured thereby, with the undoubted understanding that the policy was surrendered for the cash value upon condition that it was to be converted and changed over into the new policy. It cannot be doubted that the agents had the power to agree that the cash-surrender value of the industrial policy should be applied to the payment of premiums on the new policy if the application should be accepted. It is a matter of common knowledge that dividends and surrender values on life insurance policies are quite commonly so applied. The application should have shown the true facts, and the appellant would undoubtedly have credited the premiums against the amount due as surrender value of the old policy. The application and the surrendered industrial policy were sent to the company. The application was approved, and the policy prepared, dated November 14th, and returned to the local office, together with a check for the surrender value of the old policy.

These apparently came into the hands of the agent Stevens, who had prepared the application. He had power and authority to then and there deliver the policy. The remittance of the surrender value by check to be indorsed by the mother of the insured, and, possibly, by the insured (the facts do not clearly appear), was either in conformity to some accounting system of the appellant, or because of the error of the agent in misstating the facts in the application. Any delay caused in cashing the check cannot therefore be attributed to the insured or the beneficiary. If the premium had been credited merely as a set-off on the appellant's books, the policy would have been delivered while the insured was still in good health. The agents who solicited the insurance had power to accept payments in advance on account of premiums. Mrs. Sullivan and her son evidently intended the delivery of the industrial policy, indorsed for surrender, as a payment of the surrender value upon the premiums. The trial court must have so concluded. They were entitled to the money then. Any delay was merely for the convenience of the company in remitting. The application provides: "That the Company shall incur no liability under this application until it has been received, approved, and a policy issued and delivered, and the full first premium stipulated in the policy has actually been paid to and accepted by the Company during the lifetime of the Applicant, in which case such policy shall be deemed to have taken effect as of the date of issue as recited on the first page thereof." The policy should have been delivered in the lifetime of the applicant and while he was in good health, and, under the circumstances of this case, it must be considered to have been delivered when it reached the agent Stevens, who had power to deliver it. It was therefore delivered during the lifetime of the applicant.

The appellant contends that an affirmative duty rests

upon the insured and the beneficiary to voluntarily disclose to the company any change in the condition of health of the insured between the time of the application and the delivery of the policy. But, since it is concluded that the policy must be treated as having been delivered before the beginning of the fatal illness of the insured, the question need not be considered.

Judgment affirmed.